1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10   JEFFREY M. COVER,

11                          Petitioner,

12          v.

13   JEFFREY UTTECHT,

14                          Respondent.

CASE NO. 3:19-CV-5064-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: August 26, 2022

15          The District Court has referred this action to United States Magistrate Judge David W.

16   Christel. Petitioner Jeffrey M. Cover filed his federal habeas petition, pursuant to 28 U.S.C. §

17   2254, seeking relief from his state court convictions and sentence. *See* Dkt. 1-3. On November

18   21, 2021, Petitioner filed his Amended Petition raising five grounds for relief. Dkt. 48. After

19   review of the relevant record, the Court concludes Petitioner failed to exhaust Grounds 1 – 3 and

20   these grounds are procedurally defaulted, the state court's adjudication of Ground 4 was not

21   contrary to, nor an unreasonable application of, clearly established federal law, and Ground 5 is

22   untimely. The Court finds an evidentiary hearing is not necessary. Therefore, the Court

23   recommends the Amended Petition be dismissed and a certificate of appealability not be issued.

24

1

## I.    Background

2

A.  Factual Background

3

The Court of Appeals of the State of Washington ("state court of appeals") summarized

4

the facts of Petitioner's case as follows:

5

A.  THE ABUSE

6

S.M. was born in October 1991. Cover was born in February 1975.

7

8

S.M. grew up living with her grandmother, Sandra Cover, and her grandmother's husband Mike Cover, Sr. Mike was Cover's uncle. S.M. and Cover lived in the same mobile home park in Washougal, Washington. S.M. referred to Cover as her cousin or as "Uncle Jeff." 2 Verbatim Report of Proceedings (VRP) at 274.

9

10

11

In the summer of 2006, S.M. was staying at Cover's house, where Cover lived with his sister. Cover came home drunk and laid next to S.M. on the couch. Cover began kissing S.M., and touching her body and breasts. Cover then took S.M. to his bedroom and had sexual intercourse with her.

12

13

14

15

Thereafter, the sexual contact between S.M. and Cover became frequent. S.M. testified that Cover would come over to S.M.'s house and ask Sandra or Mike if S.M. could come baby sit for his girlfriend, Julie Barnett. Barnett also lived in the mobile home park. Cover would then take S.M. to either his house or Barnett's house, where he would then have intercourse with S.M. On one particular occasion, S.M. was at Cover's house and he performed oral sex on her while she performed oral sex on him.

16

17

18

After that incident, at the end of February or the beginning of March in 2007, while S.M. was watching Barnett's kids and drinking beers with Cover, Cover asked Barnett if Barnett would "fool around" with him and S.M. 1 VRP at 189. Barnett eventually agreed, and the three went to Barnett's bedroom. In the bedroom, Cover had sexual intercourse with S.M. and performed oral sex on S.M. Barnett also had sexual contact with S.M.

19

20

B.  THE ABUSE IS DISCLOSED

21

Megan Cover was S.M.'s aunt. Megan lived in the same mobile home park as S.M. At an Easter party in 2007, S.M. asked Megan if Barnett had a sexually transmitted disease. Nothing more was said about it that day, but a couple days later, Megan asked S.M. why she was curious about Barnett's sexual health. At that point, S.M. began crying and disclosed that she and Cover were having sex and then described the incident with Barnett in Barnett's bedroom.

22

23

24

1   Megan called the police, and the police responded within 15 to 20 minutes. The
2   responding officers were Sergeant Bradley Chicks and Officer Kim Yamashita. The
    officers interviewed S.M. at Megan's house.

3   C.  COVER MARRIES S.M.

4   The State filed criminal charges against Cover and Barnett in April or May of 2007.
    After the charges were filed, Cover's father, Sandra, Mike, and Cover decided that
5   Cover and S.M. should marry so that Cover would not get in trouble. They decided
    that Cover and S.M should go to Mississippi to be married. Sandra and Mike took
6   S.M. out of school and flew her to Mississippi. Cover drove to Mississippi with his
    father and married S.M. in Mississippi when S.M. was 15 years old. At the time of
7   trial in 2016, S.M.'s highest level of education completed remained the eighth
    grade.
8
    After Cover married S.M., S.M. "hid out at [Cover's] dad's house" in California
9   "[be]cause everyone was looking for [S.M.]." 2 VRP at 199. After an unknown
    length of time, but spanning several months, Cover called and said the charges had
10  been dismissed. S.M. then took a bus from California back to Washougal.

11  Upon her return to Washougal, Cover decided to marry S.M. a second time, "to
    make sure that [Cover and S.M. were] married." 2 VRP at 200. On or about S.M.'s
12  16th birthday, Cover married S.M. in Idaho.

13  D.  CRIMINAL CHARGES AGAINST COVER ARE FILED AGAIN

14  On July 30, 2015, the State charged Cover a second time for his conduct against
    S.M. The charging information alleged three counts of third degree rape of a child.
15  The information was subsequently amended to allege three counts of third degree
    rape of a child, with each count having occurred between April 1, 2006 and April
16  14, 2007. The case proceeded to trial on February 8, 2016.

17  E.  RELEVANT POINTS OF THE TRIAL

18      1.  Testimony

19  At trial, S.M. testified that there were several other instances of sexual intercourse
    that occurred prior to her marriage to Cover. She described a time at Cover's house,
20  sometime after the incident involving Barnett, where Cover had sexual intercourse
    with her. In all, S.M. estimated Cover had sexual intercourse with her 10 to 20 times
21  before the police were called.

22  Cover sought to impeach S.M.'s testimony by introducing a recantation letter. S.M.
    testified that the letter was written in her handwriting, but she did not recall writing
23  the letter and statements made in the letter were false.

24

REPORT AND RECOMMENDATION - 3

To rehabilitate S.M.'s credibility, the State sought to introduce prior statements S.M. made to Megan and the responding officers that were consistent with S.M.'s testimony at trial. Specifically, the State sought to introduce testimony of what S.M. had told them about the ongoing sexual relationship with Cover. Defense counsel agreed that such testimony was appropriate, saying "I'm not disagreeing with what [the State is] saying—they can use [ER] 613 for this purpose." 2 VRP at 264. Defense counsel continued, "I would agree that we have impeached her with this letter and so theoretically the court can allow for this witness and other witnesses through Rule 613 to rehabilitate her as to prior consistent statements with her testimony from today," and then asked the court to limit the testimony and not allow substantive evidence to be presented. 2 VRP at 265. The trial court ruled the rehabilitative testimony would be admitted with the limitation that the "witness may be asked about the prior disclosure but we'll limit it to instances—or at least the acknowledgement that [S.M.] indicated that she had sex with the Defendant and that she also may have had sex with the Defendant and Julie [Barnett]." 2 VRP at 268.

Chicks and Yamashita also testified at Cover's trial. Both testified that when they interviewed S.M., S.M. disclosed to them that Cover had been having sexual intercourse with her and that on one occasion both Cover and Barnett had sexual intercourse with her. Chicks also testified that S.M. told him about having oral sex with Cover and that she detailed the first time Cover had sexual contact with her. When asked what S.M. had disclosed regarding the first time Cover had sexual contact with S.M., Chicks stated, "Yes she was laying on the couch—it was the summer. She described it June or July of 2006. She would have been fourteen years old and she was awakened on the couch with him coming in." 2 VRP at 325.

At this point, Cover moved to strike and for a mistrial. Cover argued that this warranted a mistrial, or at least the statement to be stricken, because S.M. had not testified as to the time of the year that this incident occurred. The State argued that a mistrial was not warranted because evidence supporting that statement and the time of year had already been ruled admissible, as statements made by a party opponent, and would be introduced shortly. The trial court granted the motion to strike and denied the motion for mistrial. The trial court instructed the jury to "disregard the statement that the—[S.M.] may have been fourteen—that the incident may have occurred in the summer—June—July of the prior year—2006." 2 VRP at 329.

A short time later, Chicks testified that when he interviewed Cover, Cover told him that the first time he had sexual contact with S.M. had been in the summer of 2006. No objection was made.

Chicks further testified that during his interview with Cover, Cover initially denied having a sexual relationship with S.M., but eventually asked, "[I]f I tell you the truth what's in it for me—will you let me go?" 2 VRP at 339. Cover then admitted that he had touched and kissed S.M. on the couch. About an hour and a half later,

as law enforcement was preparing to transport Cover to jail, Cover admitted to Chicks that he had a sexual relationship with S.M., and that the last time he had sex with her was April 14, 2007, in Barnett's bedroom. Cover also admitted to the time he had sexual intercourse with S.M. and Barnett.

After the State rested, the defense called Shannon Patton. Patton was Cover's current fiancé. She testified that she knew Cover and S.M. when they were married, and S.M. had told Patton that Cover and S.M. did not have sex until they were married. On cross-examination, the State asked Patton if she had "spoken with the Defendant on the phone since he's been in custody at the Clark County Jail" and if she knew that those phone calls were recorded. 3 VRP at 449–50. Cover did not object. Patton answered that she had spoken to Cover and she did know the calls were recorded.

   2.  Closing Arguments

During the State's closing, the prosecutor argued:

> So Count Three—the Defendant himself actually gives us the dates—the exact date for Count Three. And you can recall Sgt. Chicks testified that the Defendant started admitting to him what happened—admitted to him that he was in this relationship with [S.M.]—that he loved her—he couldn't help it and yes he's been having sex with her.

> He admitted the last time they had sex was Saturday, April—let me make sure I'm right—April 14th, 2007. They [Chicks and Cover] were having this conversation—I believe—on April 21st—just about a week later and the Defendant admits that was the last time he had sex with her. That he picked her up early in the morning and brought her to Julie's. That's consistent with what [S.M.] told us. Again [S.M.] couldn't remember the exact dates but she said that after the threesome the Defendant took her to Julie's house to have sex multiple times—and he took her back to his house to have sex as well.

> She said that he would pick her up in the morning and bring her over to Julie's house while Julie was at work and Julie's kids would be asleep or in their rooms. Well that's what the Defendant said happened on the 14th. He said he picked up [S.M]—they went to the house and Julie's kids were asleep during that incident.

> ....

> Now these aren't the only incidents [S.M.] describes. In addition to these kind of three separate and distinct times that they had sexual intercourse as defined here she also describes that they had oral sex on occasion.

1    She described—calling what she called 69 where she gave him oral sex and
2    he gave her oral sex at the same time. She said that happened before the
     threesome with Julie Barnett. And she described that he had sex with her at
3    his house as well.

     3 VRP at 493–95.
4
     The defense argued in closing, "This case ultimately comes down to the words of
5    [S.M.] .... It ultimately comes down to her word." 3 VRP at 501. The defense then
     proceeded to point out all of the pieces of the abuse that S.M. could not remember
6    or had recanted and argued that Megan did not like Cover or Barnett.

7    In rebuttal, the prosecutor responded,

8        Now for the defense's theory to be true—that this didn't happen—we would
         have to have two false confessions—the Defendant and the Ms. Barnett.
9        We'll get into specifics.

10       We would have to have two people that are saying—that are talking about
         these sex acts that are making these accusations— two separate times—nine
11       years apart. We would have to have [S.M.] not only lying to you today but
         also lying back in 2007.
12
         And Julie Barnett would have to be lying today and also in 2007. We would
13       have to have Megan being the mastermind behind this whole thing.

14   3 VRP at 522.

15   F.   VERDICT AND SENTENCE

16   The jury convicted Cover of all three counts of third degree rape of a child. The
     jury also found by special verdict the aggravating factors that each count was
17   committed as "part of an ongoing pattern of sexual abuse of the same victim under
     the age of 18 years manifested by multiple incidents over a prolonged period of
18   time," and that "the defendant demonstrate[d] or display[ed] an egregious lack of
     remorse." Clerk's Papers (CP) at 163–68.
19
     Cover's offender score was calculated to be 6. The Department of Corrections
20   recommended an exceptional sentence upward in its presentence investigation
     report. At sentencing, the State requested an exceptional sentence upward. Defense
21   counsel conceded that an exceptional sentence upward was appropriate. The
     defense counsel argued:
22
         So the question for the court is not whether or not to impose punishment.
23       Obviously punishment is appropriate and it's our contention that it's not even
         a question of whether the court should go above the standard range.
24

1

2
> We think the fact that the jury found the aggravating factors that the court has
> a basis and—and perhaps even an obligation to go above the standard range

3
> of—up to sixty months. But I think forty-eight or forty-six to sixty months
> would be the standard range for each of the three counts.

4
> We'd ask the court to consider exceeding the sixty months but by a smaller

5
> margin than as suggested either by the State or by the Department of
> Corrections. A hundred and eighty months or a hundred and fifty months
> would be—I think—an exceedingly long sentence for what was alleged and

6
> what was proven here—longer than we feel is necessary.

7
4 VRP at 557–58.

8
The sentencing court found an exceptional sentence upward was appropriate and
sentenced Cover to 180 months. In making this finding, the sentencing court read

9
RCW 9.94A.537 out loud, noted that the jury had found aggravating circumstances
in this case, and explained that the court had authority to impose an exceptional

10
sentence upward. The sentencing court discussed the purpose of the sentencing
statute, stated that there was no doubt that Cover's acts were egregious and without

11
remorse, and said:

12
> As I indicated both substantial and compelling reasons are the fact that you
> engaged in this sex with a fourteen year old—that you continued to engage

13
> in sex with this fourteen year old—that you married her—you took her to
> Mississippi—you took her to Idaho. You then had her move to California

14
> with her [sic]. At some point in time—you essentially abandoned her at some
> point in time.

15
> The facts I heard do not warrant any leniency whatsoever. I'm going to go

16
> ahead and follow the recommendations of the State.

17
4 VRP at 564–65. The sentencing court also entered written findings and
conclusions for imposing the exceptional sentence, citing the jury's findings that

18
the two aggravators applied to each of the three crimes, and concluding that there
were substantial and compelling reasons to impose the exceptional sentence.

19
*State v. Cover*, 200 Wash. App. 1044, *1-5 (2017) (internal footnotes omitted); Dkt. 32-1, pp.

20
801-09 (Exhibit 12).

21

22

23

24

1    B.   Procedural Background

2        1.   *Direct Appeal*

3        Petitioner challenged his Clark County Superior Court ("trial court") judgment and

4   sentence on direct appeal. *See* Dkt. 32-1, pp. 682-730, 733 (Exhibits 9, 10). The state court of

5   appeals affirmed Petitioner's judgement and sentence. *Id*. at pp. 800-32 (Exhibit 12). Petitioner

6   sought discretionary review by the Washington State Supreme Court ("state supreme court"). *Id*.

7   at pp. 834-94 (Exhibit 13). On February 7, 2018, the state supreme court denied Petitioner's

8   petition for review without comment. *Id*. at p. 896 (Exhibit 14). The state court of appeals issued

9   its mandate on March 19, 2018. *Id*. at p. 898 (Exhibit 15).

10        2.   *Personal Restraint Petition*

11        On January 28, 2019,[1] Petitioner filed a personal restraint petition ("PRP") seeking state

12   post-conviction relief. *See* Dkt. 32-1, pp. 901-29 (Exhibit 16). The state court of appeals denied

13   the PRP. *Id*. at pp. 1072-76 (Exhibit 19). Petitioner sought discretionary review, which was

14   denied by the deputy commissioner of the state supreme court on June 4, 2020. *Id*. at pp. 1086-

15   1114, 1149-54 (Exhibits 22, 25). Petitioner filed a motion to modify the ruling on September 18,

16   2020. *Id*. at pp. 1156-76 (Exhibit 26). Petitioner's motion to modify was denied by the state

17   supreme court on November 4, 2020. *Id*. at p. 1179 (Exhibit 27). The state court of appeals

18   issued the certificate of finality on November 25, 2020. *Id*. at p. 1181 (Exhibit 28).

19        3.   *Federal Petition*

20        On January 22, 2019, Petitioner filed his Petition. Dkts. 1, 3. In the Petition, Petitioner

21   raised the following grounds for relief:

22   _____

23        [1] The prison "mailbox rule" is not available when filing a PRP in Washington State; therefore, Petitioner's
    PRP was deemed filed on the date it was received by the state clerk's office. *In re Carlstad*, 150 Wash.2d. 583, 590
24   (2003).

1.  Insufficient evidence on corpus delicti grounds;
2.  Sixth Amendment rights were violated when the trial court used facts that did not support aggravators (exceptional sentence);
3.  Ineffective assistance of counsel under the Sixth Amendment – Counsel asked for exceptional sentence, failed to inform Petitioner of a plea deal, and failed to provide a medical expert; and
4.  Prosecutorial misconduct.

Dkt. 3. On April 17, 2019, Respondent filed, and served on Petitioner, an Answer. Dkts. 9, 10. Proceedings in this case were stayed during the pendency of Petitioner's state PRP and, on January 12, 2021, the stay was lifted. Dkts. 7, 12, 26. On March 1, 2021, Respondent filed an Answer and the state court record. Dkt. 31, 32. After the Court granted a lengthy extension of time, Petitioner filed a traverse on June 29, 2021. Dkt. 36; *see also* Dkt. 35. In the June 2021 traverse, Petitioner raised additional grounds for relief. Dkt. 36. As the traverse was not the proper pleading to raise new grounds for relief, the Court directed Petitioner to file a motion to amend if he sought to pursue different grounds for relief. *See* Dkt. 38.

Petitioner filed a motion to amend and proposed amended petition. Dkt. 45. While Respondent did not oppose the motion to amend, Respondent did not waive any defense based upon exhaustion, procedural bar, or statute of limitations. Dkt. 46. On November 22, 2021, the Court granted Petitioner leave to file an amended petition and directed the Amended Petition to be filed. Dkts. 47, 48. The Court stated that the Amended Petition superseded the original petition and the previously filed petition and answer to the petition were moot. Dkt. 47. Therefore, the only matters before the Court are the five grounds raised in the Amended Petition.

In the Amended Petition, Petitioner asserts the following grounds for relief:

1.  Insufficient evidence;
2.  Ineffective assistance of counsel – counsel failed to provide a medical expert to rebut the State's medical expert;
3.  Ineffective assistance of counsel – counsel requested and argued for an exceptional sentence upward;
4.  Ineffective assistance of counsel – plea and settlement offer; and

5.  Acts charged and tried to jury were beyond the limitations of actions of RCW 9A.04.080.

Dkt. 48. On January 5, 2022, Respondent filed, and served on Petitioner, an Answer to the Amended Petition. Dkt. 49. In the Answer, Respondent asserts the grounds are either untimely, unexhausted and procedurally barred from federal review, or that the state court's adjudication was not contrary to, or an unreasonable application of, clearly established federal law. *Id.* After several extensions of time, Petitioner filed a Traverse on May 6, 2022. Dkt. 54; *see also* Dkts. 50-53.

## II.  Discussion

Respondent maintains: (1) Ground 5 is untimely; (2) Petitioner failed to exhaust Grounds 1-3 and is procedurally barred from federal review of these grounds; and (3) the state court's adjudication of Ground 4 was not contrary to, or an unreasonable application of, clearly established federal law. Dkt.49.

A.  Time Bar (Ground 5)

Respondent first asserts the statute of limitations bars this Court's review of Ground 5 because Ground 5 does not relate back to the original petition. Dkt. 49.

1.  *Statute of Limitations*

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which is codified at 28 U.S.C. § 2241 *et seq.*, a one-year statute of limitations applies to federal habeas petitions. Section 2244(d)(1)(A) requires a prisoner to file a habeas petition within one year of "the date on which the [state court] judgment [of conviction] became final by the conclusion of direct review or the expiration of the time for seeking such review." If during the limitations period a "properly filed application for state post-conviction or other collateral review . . . is

1   pending," the one-year period is tolled. 28 U.S.C. § 2244(d)(2); *see Pace v. DiGulielmo*, 544

2   U.S. 480, 410 (2005).

3          A direct review generally concludes and the judgment becomes final either upon the

4   expiration of the time for filing a petition for writ of certiorari with the United States Supreme

5   Court, or when the Supreme Court rules on a timely filed petition for certiorari. *Bowen v. Roe*,

6   188 F.3d 1157, 1158-59 (9th Cir. 1999). Petitioner filed a direct appeal challenging his

7   conviction and sentence. Dkt. 32-1, pp. 682-730, 733 (Exhibits 9, 10). The state supreme court

8   denied review on February 7, 2018. *Id*. at p. 896 (Exhibit 14). Petitioner did not file a petition for

9   writ of certiorari in the United States Supreme Court (*see* Dkt. 49, p. 12), making his direct

10  appeal final on May 8, 2018, the date the time for filing a petition for certiorari expired. *See* U.S.

11  Sup. Ct. Rule 13 (a writ of certiorari must be filed within 90 days after entry of the judgment).

12  The AEDPA limitations period began running the next day, on May 9, 2018. *See Corjasso v.*

13  *Ayers*, 278 F.3d 874, 877 (9th Cir. 2002).

14         The limitations period ran for 264 days, then, on January 28, 2019 -- the date Petitioner

15  filed his PRP -- the limitations period tolled pursuant to 28 U.S.C. § 2244(d)(2). *See* Dkt. 32-1,

16  pp. 901-29 (Exhibit 16). The limitations period resumed on November 26, 2020, the day after

17  Petitioner's PRP became final. *See* Dkt. 32-1, p. 1181 (Exhibit 28); *see also Corjasso*, 278 F.3d

18  at 879 (finding the statute of limitations remains tolled until the state collateral attack becomes

19  final); *Certification from United States Court of Appeals, Ninth Circuit in Phonsavanh*

20  *Phongmanivan v. Haynes*, 458 P.3d 767, 770 (Wash. 2020) (a PRP becomes final under

21  Washington state law when the certificate of finality is issued). The statute of limitations then ran

22

23

24

for 101 days, or until March 8, 2021, at which point the limitations period expired.[2] More than six months after the limitations period expired, on October 26, 2021, Petitioner filed the motion to amend and, on November 22, 2021, the Court granted Petitioner leave to file the Amended Petition. *See* Dkts. 45, 48.[3]

Petitioner filed his original petition on January 22, 2019. Dkt. 1. However, filing a federal habeas petition does not toll the limitations period. *See Duncan v. Walker*, 533 U.S. 167, 181-82 (2001). While a habeas petition may be amended as provided by Rule 15 of the Federal Rules of Civil Procedure, if the amended pleading is filed after the statute of limitations has run, the newly asserted grounds must relate back to the original habeas petition. *Mayle v. Felix*, 545 U.S. 644, 649 (2005). Federal Rule of Civil Procedure 15(c)(1)(B) addresses amended pleadings, and states in relevant part, that "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out – or  attempted to be set out – in the original pleading[.]" *See also Mayle*, 545 U.S. at 649. As the motion to amend was not filed until well after the limitations period had expired, the grounds in the Amended Petition must relate back to the original petition to be timely filed.

To relate back to the original petition, there must be a common core of operative facts uniting the original grounds and the newly asserted grounds. *Mayle*, 545 U.S. at 659. "An

---

[2] The one-year time period expired on Sunday, March 7, 2021, giving Petitioner until Monday, March 8, 2021, to file a petition. *See* Fed. R. Civ. P. 6(a)(1)(C).

[3] The Court notes Petitioner filed a Motion for Appointment of Counsel and Lift of Stay ("Motion") on December 2, 2020. Dkt. 24. In the Motion, Petitioner requested Court-appointed counsel and requested the stay be lifted. *Id*. Petitioner did not seek leave to amend or supplement the original petition. *See id*. Petitioner, however, attached a document that appears to be an amended petition. *See id*. at pp. 6-29. The Court did not interpret the Motion as a motion to amend and did not grant Petitioner leave to supplement or amend the original petition. *See* Dkt. 26. Further, neither party proceeded in this case as if the original petition was amended or supplemented on December 2, 2020. Therefore, the Court finds the document attached to the Motion did not amend or supplement the original petition. *See* Fed. R. Civ. P. 15(a) (leave of court is required to amend if sought more than 21 days after a responsive pleading is filed).

amended habeas petition 'does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Hebner v. McGrath*, 543 F.3d 1133, 1138 (9th Cir. 2008) (quoting *Mayle*, 545 U.S. at 650).

In the original petition, Petitioner alleged there was insufficient evidence to convict, his sentence was excessive, his counsel was ineffective, and the prosecutor engaged in misconduct. *See* Dkt. 3. In the Amended Petition, Petitioner reasserts the insufficient evidence and ineffective assistance of counsel claims, which relate back to the original petition. *See* Dkt. 48. However, in Ground 5 of the Amended Petition, Petitioner alleges the acts charged and tried were outside the statute of limitations. *Id.* Petitioner's original petition does not recite any of the facts needed to support Ground 5. There are no allegations related to the charging of the crimes or the statute of limitations in the original petition. *See* Dkt. 3. Ground 5 is, therefore, different in time and type to the grounds raised in the original petition and the original petition does not contain the essential factual predicates of Ground 5. *See Martin v. Hubbard*, 192 F. App'x 616, 617-18 (9th Cir. 2006) (requiring the original petition to contain the "essential factual predicates of the later claims[ ]"); *Preston v. Harris*, 216 F. App'x 677, 678 (9th Cir. 2007) (denying relation back where claims involve different errors, actors, and times).

Petitioner states that Respondent should have been on notice of Ground 5 because, in the original petition, Petitioner informed the Court that he was raising a limitations of actions claim in his state PRP. *See* Dkt. 54; *see also* Dkt. 3 at p. 12. At issue is whether Ground 5 relates back to a ground raised in the original petition. The Court finds the list of PRP claims identified in the original petition did not sufficiently raise Ground 5 in the original petition. As such, there was no ground for federal relief in the original petition that was similar in time and type to Ground 5. Therefore, Ground 5 does not relate back to the original petition and is untimely.

2.  *Equitable Tolling*

The AEDPA statute of limitations is subject to equitable tolling where the petitioner pursued his rights diligently and "some extraordinary circumstance stood in his way." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotations omitted). To receive equitable tolling, a petitioner at the very least must show the extraordinary circumstances "were the but-for and proximate cause of his untimeliness." *Ansaldo v. Knowles*, 143 Fed. App'x. 839, 840 (9th Cir. 2005). Petitioner does not argue he is entitled to equitable tolling and fails to demonstrate any extraordinary circumstance prevented him from filing a timely habeas petition. *See* Dkts. 48, 54. The Court finds Petitioner was aware of Ground 5 when he filed the original petition and has not shown an extraordinary circumstance prevented him from raising the claim in his original petition. Therefore, Petitioner fails to show he is entitled to equitable tolling and Ground 5 is barred by the § 2244 limitations period. Accordingly, the Court recommends Ground 5 be dismissed.

B.  Exhaustion and Procedural Default

Respondent argues Grounds 1-3 are unexhausted and barred from federal review. Dkt. 49.

1.  *Exhaustion of State Remedies*

"[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275 (1971). Petitioner's claims will be considered exhausted only after "the state courts [have been afforded] a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one

complete round of the State's established appellate review." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A federal habeas petitioner must provide the state courts with a fair opportunity to correct alleged violations of federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Middleton v. Cupp*, 768 F.2d 1083, 1086 (9th Cir. 1985) (petitioner "fairly presented" the claim to the state supreme court even though the state court did not reach the argument on the merits). It is not enough if all the facts necessary to support the federal claim were before the state courts or if a somewhat similar state law claim was made. *Duncan*, 513 U.S. at 365-66 (citing *Picard*, 404 U.S. at 275; *Anderson v. Harless*, 459 U.S. 4 (1982)). Petitioner must include reference to a specific federal constitutional guarantee, as well as a statement of the facts entitling Petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162-163 (1996); *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005). Petitioner bears the burden of proving he has exhausted available state remedies and retains the burden to prove all facts relevant to the exhaustion requirement. *See Rose v. Lundy*, 455 U.S. 509, 520 (1982); 28 U.S.C. § 2254(b)(1)(A).

Respondent contends Petitioner failed to raise a federal constitutional violation before the state courts regarding Ground 1. Dkt. 49, p. 17. As stated above, "for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray*, 518 U.S. 162–63. Vague references to broad constitutional principles such as due process, equal protection and a fair trial do not satisfy the exhaustion requirement. *Id*. at 162; *Hiivala v. Wood,* 195 F.3d 1098, 1106 (9th Cir.1999); *Gatlin v. Madding,* 189 F.3d 882, 888 (9th Cir. 1999). Even where the petitioner argues an error deprived him of a "fair trial" or the "right to present a defense", unless the petitioner expressly states he is alleging a specific federal constitutional violation, the petitioner has not properly exhausted the claim. *Johnson v. Zenon,*

88 F.3d 828, 830–31 (9th Cir. 1996). Moreover, the fact that a state law claim was "essentially the same" as the claim subsequently asserted in federal court does not satisfy the exhaustion requirement. *Id.* at 830. Citation to Washington case law, even if the case applied a standard similar to the federal standard, does not suffice to apprise the Washington courts of a federal claim. *Hiivala,* 195 F.3d at 1106–07.

In Ground 1, Petitioner alleges there was insufficient evidence to convict him because there was no corroborative evidence to support Petitioner's admittance that he had sex with S.M. Dkt. 48, p. 5. During his direct appeal, Petitioner alleged, similar to Ground 1, that, because there was no independent evidence to corroborate Petitioner's statement, his statement regarding having sex with S.M. was inadmissible. Dkt. 32-1, pp. 700-04. Petitioner cited to only state law and did not raise this claim as a federal constitutional violation. *See id.* In his petition for discretionary review, Petitioner raised the same claim. *See id.* at p. 839. Again, Petitioner cited to only state law and did not assert a federal constitutional violation. *See id.* at pp. 844-46. Petitioner did not raise Ground 1 in the PRP. *See id.* at pp. 902-925, 1091. As Petitioner did not raise Ground 1 as a federal constitutional claim through each stage of direct review or in his PRP, Ground 1 was not properly exhausted. *See Casey*, 386 F.3d at 914 (internal quotations omitted) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court."); *Smith v. McKenna*, 2009 WL 1181261, at *9 (W.D. Wash. Apr. 30, 2009) (finding the petitioner did not exhaust when he made no reference to any specific federal constitutional guarantee or federal case law in support of the relief he sought).

Respondent also maintains Grounds 2 and 3 are unexhausted because Petitioner did not raise these grounds at each level of the state court review. Dkt. 49, p. 17. In Grounds 2 and 3, Petitioner alleges that his counsel was ineffective for failing to provide a medical expert to rebut

1    the State's medical expert and for requesting and arguing for an exceptional sentence. Dkt. 48,

2    pp. 7-8. Petitioner did not raise either ground in his direct appeal. *See* Dkt. 32-1, pp. 684-85, 733,

3    836. Petitioner raised both grounds in his PRP. *See id*. at pp. 911-20. However, in his motion for

4    discretionary review filed with the state supreme court, Petitioner did not raise Grounds 2 or 3.

5    *See id*. at p. 1087. Rather, the only ineffective assistance of counsel claim raised in Petitioner's

6    motion for discretionary review alleged that counsel's conduct in communicating a plea

7    agreement to Petitioner was deficient. *Id*. at pp. 1087, 1095-1100. As Petitioner did not raise the

8    allegations contained in Grounds 2 or 3 during his direct appeal or at each level of his PRP, he did

9    not give the state court a full and fair opportunity to determine if a federal constitutional violation

10   occurred. *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary

11   'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court

12   (including a state supreme court with powers of discretionary review), thereby alerting that court

13   to the federal nature of the claim."); *Ortberg v. Moody*, 961 F.2d 135, 138 (9th Cir. 1992)

14   (finding claims were unexhausted when they were not raised on every level of direct review);

15   *O'Haver v. Ruiz*, 2016 WL 1019264, * 4 (W.D. Wash. Feb. 11, 2016) ("A petitioner must properly

16   raise a habeas claim at every level of the state courts' review."). Therefore, Grounds 2 and 3 were

17   not properly exhausted.

18            *2.   Procedural Default*

19            Procedural default is distinct from exhaustion in the habeas context. *Franklin v. Johnson*,

20   290 F.3d 1223, 1230 (9th Cir. 2002). The procedural default rule bars consideration of a federal

21   claim when it is clear the state court has been presented with the federal claim but declined to

22   reach the issue for procedural reasons or it is clear the state court would hold the claim

23   procedurally barred. *Id.* at 1230-31 (citations omitted). If a state procedural rule would now

24

1    preclude the petitioner from raising his claim at the state level, the claim is considered

2    "procedurally defaulted" and the federal courts are barred from reviewing the petition on the

3    merits. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *O'Sullivan*, 526 U.S. at 845.

4         Grounds 1-3 are procedurally defaulted because if Petitioner attempted to present these

5    claims in a subsequent PRP, the state court would find the claims barred by Washington State

6    law. Washington State imposes a one-year statute of limitations on filing a PRP or other post-

7    conviction challenges. RCW § 10.73.090. The state court of appeals issued a mandate finalizing

8    Petitioner's direct appeal on March 19, 2018. Dkt. 32-1, p. 898. The time to file a petition or

9    motion for post-conviction relief expired in March 2019, one year after Petitioner's direct appeal

10   became final. *See* RCW 10.73.090(1), (3)(b). As the one-year statute of limitations has passed,

11   Petitioner is barred from filing a subsequent PRP. *See id*. at (1); *see also Shumway v. Payne*, 223

12   F.3d 982, 988 n. 22 (9th Cir. 2000) (RCW 10.73.090 has been found by the Ninth Circuit to be

13   an independent and adequate state law barring federal habeas review).

14        Further, under Washington State law, the state court of appeals will not consider a second

15   or successive PRP unless the petitioner certifies he has not filed a previous petition on similar

16   grounds and shows good cause as to why he did not raise the grounds in the previous PRP. *See*

17   RCW 10.73.140. Petitioner has not presented facts which could show good cause for his failure

18   to raise Grounds 1-3 at each level of his PRP. Therefore, Grounds 1-3 are also subject to an

19   implied procedural bar because the grounds would be "prohibited by an independent, adequate,

20   and mandatory rule of state procedure, R.C.W. § 10.73.140, making a return to state court

21   futile." *See Bolar v. Luna*, 2007 WL 1103933, at *11 (W.D. Wash. April 10, 2007).

22        Petitioner would be precluded from asserting Grounds 1-3 in the state court; therefore,

23   these grounds are procedurally defaulted in federal court. *See Coleman*, 501 U.S. at 731-32, 735

24

n.1; *Casey*, 386 F.3d at 920; *Eisermann v. Penarosa*, 33 F.Supp.2d 1269, 1274 (D. Haw. 1999) ("[I]f a petitioner has never raised his federal claim to the highest state court available and is now barred from doing so by a state procedural rule, exhaustion is satisfied because no state remedy remains available, but the petitioner has procedurally defaulted on his claim.").

However, the procedural default will be excused and a petitioner will be entitled to federal habeas corpus review if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice[.]" *See Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998) (citing *Coleman*, 501 U.S. at 750). To establish "cause," a petitioner must show some objective factor external to the defense prevented him from complying with the state's procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause and prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Murray,* 477 U.S. at 495–96. To demonstrate he suffered a fundamental miscarriage of justice, viewing all the evidence in light of new reliable evidence, the petitioner must show "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Here, Petitioner fails to show some objective factor external to his defense prevented him from complying with the State's procedural bar rule. Petitioner also fails to show the alleged trial

1    errors worked to his actual and substantial disadvantage, infecting his entire trial with errors of

2    constitutional dimensions, and thus has not shown prejudice. Furthermore, Petitioner has not

3    provided new, reliable evidence showing he is actually innocent and, therefore, this is not the

4    kind of extraordinary instance where this Court should review the claim despite the absence of a

5    showing of cause. As Petitioner failed to show cause or prejudice to excuse his procedural

6    default, the Court is barred from reviewing Grounds 1-3 on the merits.

7         In sum, there is no evidence Petitioner exhausted the state court remedies to the highest state

8    court for Grounds 1-3. As Petitioner bears the burden of proving he exhausted the available state

9    court remedies and as there is no evidence showing Petitioner gave the state court a full and fair

10   opportunity to determine if a federal constitutional violation occurred, Grounds 1-3 were not

11   properly exhausted. *See Braley v. Crownes*, 2005 WL 2304273, at *1 (E.D. Cal. Sept. 20, 2005)

12   (dismissing petition for failure to exhaust where the petitioner claimed he was entitled to be

13   released, but had not raised the claims to the highest state court). Grounds 1-3 are procedurally

14   defaulted. As Petitioner has not overcome the procedural default, the Court recommends

15   Grounds 1-3 be dismissed. *See Casey*, 386 F.3d at 920-21.

16        C.  Review of State Court's Adjudication

17        Respondent maintains the state courts' adjudication of Ground 4 -- the only remaining

18   ground raised in the Amended Petition -- was not contrary to, or an unreasonable application of,

19   clearly established federal law. Dkt. 49.[4]

20

21

22

23       [4] Respondent also argues Grounds 1-3 should be denied on the merits. *See* Dkt. 49. However, as the Court

24   finds it is procedurally barred from considering these grounds, the Court declines to consider Grounds 1-3 on the merits.

1      1.  *Standard of Review*

2          Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the

3  basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a

4  decision that was contrary to, or involved an unreasonable application of, clearly established

5  Federal law, as determined by the Supreme Court of the United States." In interpreting this

6  portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to"

7  clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion

8  opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts

9  "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite

10  result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

11         Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

12  because that court concludes in its independent judgment that the relevant state-court decision

13  applied clearly established federal law erroneously or incorrectly. Rather, that application must

14  also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An

15  unreasonable application of Supreme Court precedent occurs "if the state court identifies the

16  correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

17  of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court

18  decision involves an unreasonable application of Supreme Court precedent "'if the state court

19  either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

20  where it should not apply or unreasonably refuses to extend that principle to a new context where

21  it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529

22  U.S. at 407).

23

24

1    The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas

2    courts to presume the correctness of state courts' factual findings unless applicants rebut this

3    presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of

4    state court decisions under §2254(d)(1) is "limited to the record that was before the state court

5    that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

6           2.   *Ineffective Assistance of Counsel (Ground 4)*

7           In Ground 4 of the Amended Petition, Petitioner alleges he received ineffective assistance

8    of counsel regarding counsel's conduct surrounding plea and settlement offers. Dkt. 48, p. 10.

9           In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part

10   test for determining whether a defendant received ineffective assistance of counsel. First, a

11   defendant must demonstrate his attorney's performance was deficient, which requires showing

12   "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

13   the Sixth Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient

14   performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

15          Under the first prong, the reasonableness of an attorney's performance is to be evaluated

16   from counsel's perspective at the time of the alleged error and in light of all the circumstances.

17   *Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

18   presumption that counsel's conduct falls within the wide range of professional assistance; that is,

19   the defendant must overcome the presumption that, under the circumstances, the challenged

20   action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

21          Under the prejudice prong, a petitioner must establish there is a reasonable probability the

22   results would have been different but for counsel's deficient performance. *Kimmelman v.*

23   *Morrison*, 477 U.S. 365, 375 (1986); *Strickland*, 466 U.S. at 696. "A reasonable probability is a

24

1  probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A]

2  court need not determine whether counsel's performance was deficient before examining the

3  prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to

4  dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course

5  should be followed." *Id*. at 697.

6         The *Strickland* standards apply to claims of ineffective assistance of counsel involving

7  counsel's advice offered during the plea bargain process. *Missouri v. Frye*, 566 U.S. 134 (2012);

8  *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky,* 559 U.S. 356 (2009); *Hill v.*

9  *Lockhart,* 474 U.S. 52, 58 (1985); *Nunes v. Mueller,* 350 F.3d 1045, 1052 (9th Cir.2003). "[A]s a

10  general rule, defense counsel has the duty to communicate formal offers from the prosecution to

11  accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at

12  145. "In the context of plea offers, a petitioner must show the outcome of the plea process would

13  have been different with competent advice." *Lafler*, 566 U.S. at 163.

14         In determining Petitioner's trial counsel was not ineffective for failing to communicate a

15  plea offer, the state court of appeals stated:

16      [Petitioner] argues that his trial counsel was ineffective in not conveying a second
    plea offer following the discovery of a purported recantation letter from the victim.

17      [FN.3 At trial, the victim was confronted with the letter, which she denied having
    written.] But the State provides documentation that there was no second plea offer

18      and that trial counsel conveyed the one plea offer the State had made. . . . .
    [Petitioner] does not show ineffective assistance of counsel.

19
20  Dkt. 32-1, p. 1074. In affirming the state court of appeals decision, the deputy commissioner for

the state supreme court found:
21

22      [Petitioner] argued in his petition that defense counsel was ineffective in not
    conveying to him a second plea offer following the discovery of a purported

23      recantation letter by the victim. But because the State provided documentation
    showing that it made no second offer, and that the one offer it made was conveyed

24      to [Petitioner] by defense counsel, the Court of Appeals rejected this argument.

1     [Petitioner] now contends that counsel conveyed the original offer inaccurately (recommended sentence of 50 months rather than the actually offered 60 months),

2     and that counsel assured him he could procure a better offer based on the recantation letter. Further, [Petitioner] contends that counsel undermined the

3     original plea offer by interviewing the victim. But in his petition [Petitioner] focused on the purported failure to convey a second offer. He did not suggest then

4     that counsel had conveyed the original offer inaccurately but mentioned this matter for the first time in his reply to the State's answer to his petition. The Court of

5     Appeals committed no error in not addressing this matter first raised in a reply. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549

6     (1992). Further, defense counsel has stated that he conveyed the original offer to [Petitioner], that they discussed making a counteroffer, and that [Petitioner] did not

7     want to make a counteroffer but wanted to proceed to trial. [Petitioner] asserts that he wished to plead guilty, but he does not show he made that wish known to

8     counsel.

9  *Id*. at pp. 1152-53.

10     The state court record reflects the deputy prosecuting attorney extended only one offer of

11  settlement –a 60 month sentence recommendation – to Petitioner's trail counsel in the underlying

12  criminal case. *Id*. at p. 1008-09. Petitioner's trial counsel, Jeffrey Staples, submitted a declaration

13  in the response to Petitioner's PRP, stating,

14     I communicated the offer of settlement made by the State to [Petitioner]. We discussed the offer and the pros and cons of accepting the offer. There was no

15     second offer made by the State, although the prosecutor and I had some discussion about possible counter-offers that [Petitioner] could make. During a discussion with

16     [Petitioner] on January 8, 2016, he and I discussed the risks at trial and our defense strategy. [Petitioner] communicated that he did not want to accept the prosecutor's

17     plea offer and did not want to propose a counter offer, rather he wanted to proceed to trial.

18  *Id*. at p. 1012.

19

20     Based on the record, Petitioner's trial counsel communicated the only plea offer to

21  Petitioner. Petitioner has presented no evidence to show his counsel failed to communicate a plea

22  offer to Petitioner that he would have accepted. *See* Dkt. 48. Rather, the record shows trial

23  counsel communicated the only plea offer to Petitioner, Petitioner considered the offer, and

24  decided he wanted to proceed to trial. Petitioner submits only a conclusory allegation in his

1  Amended Petition that counsel was ineffective regarding the "plea and settlement offer." *Id*. at

2  10. [5] As Petitioner has provided no evidence to support his conclusory statement that counsel

3  was ineffective, Petitioner has failed to demonstrate the state court's conclusion that counsel was

4  not ineffective for failing to communicate a plea offer was contrary to, or an unreasonable

5  application of, clearly established federal law. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)

6  ("Conclusory allegations which are not supported by a statement of specific facts do not warrant

7  habeas relief."); *Rise v. Glebe*, 2015 WL 4877836, at *14 (W.D. Wash. June 9, 2015), *report and*

8  *recommendation adopted*, 2015 WL 4877848 (W.D. Wash. Aug. 14, 2015) (finding the state

9  court's rejection of ineffective assistance of counsel claim for failure to communicate a plea offer

10  was reasonable when there was no evidence in the record showing the prosecutor was interested in

11  or ever made a plea offer that trial counsel failed to communicate to the petitioner). Therefore, the

12  Court recommends Ground 4 be dismissed.

13  **III.    Evidentiary Hearing**

14  The decision to hold an evidentiary hearing is committed to the Court's discretion.

15  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

16  hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

17  entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

18  available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

19  state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

20  entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

21

22

23  [5] Petitioner states "see attached at Argument III" for supporting facts. Dkt. 48, p. 10. Petitioner, however, did not provide an attachment to the Amended Petition. The Court has considered the argument in Petitioner's June 29, 2021 filing. *See* Dkt. 36, pp. 27-30. The Court finds, at most, Petitioner alleges his trial counsel failed to communicate the correct offer and Petitioner was waiting for an additional offer. *Id*. Petitioner has not produced

24  sufficient evidence showing his counsel's performance surrounding the plea negotiations was deficient.

record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to hold an evidentiary hearing in this case because, as discussed in this Report and Recommendation, Petitioner's grounds may be resolved on the existing state court record.

## IV.    Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Amended Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to this case.

## V.    Conclusion

For the above stated reasons, the Court concludes Ground 5 is untimely, Petitioner failed to exhaust Grounds 1 – 3 and these grounds are procedurally defaulted, and the state court's adjudication of Ground 4 was not contrary to, nor an unreasonable application of, clearly established federal law. The Court finds an evidentiary hearing is not necessary. Therefore, the

1    Court recommends the Amended Petition be dismissed and a certificate of appealability not be

2    issued.

3            Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

4    fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

5    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

6    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

7    objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

8    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

9    imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on

10   August 26, 2022, as noted in the caption.

11           Dated this 10th day of August, 2022.

12

13   _____
     David W. Christel
14   United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24