UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEFFREY M. COVER,

    Petitioner,

v.

JEFFREY UTTECHT,

    Respondent.

CASE NO. 3:19-CV-5064-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: July 28, 2023

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Jeffrey M. Cover filed his federal habeas petition, pursuant to 28 U.S.C. §2254, seeking relief from his state court convictions and sentence. *See* Dkt. 1-3. On November 21, 2021, Petitioner filed his Amended Petition raising five grounds for relief. Dkt. 48. On August 10, 2022, the undersigned entered a Report and Recommendation ("R&R") finding that: Petitioner failed to exhaust Grounds 1 – 3 and those grounds were procedurally defaulted, the state court's adjudication of Ground 4 was not contrary to, nor an unreasonable application of, clearly established federal law, and Ground 5 was untimely. The Honorable Benjamin H. Settle, the District Judge assigned to this case, adopted the R&R as to Grounds 1-4 and reserved ruling

on Ground 5. Dkt. 59. This matter has been referred to the undersigned for consideration of Ground 5 on the merits.

The Court has considered the relevant record and finds Ground 5 is not a cognizable claim in a federal habeas proceeding and, if it was, the state court's adjudication of Ground 5 was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends Ground 5 be denied, a certificate of appealability not be issued, and this case be closed.

**I.    Background**

A. Factual Background

The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> A. THE ABUSE
>
> S.M. was born in October 1991. Cover was born in February 1975.
>
> S.M. grew up living with her grandmother, Sandra Cover, and her grandmother's husband Mike Cover, Sr. Mike was Cover's uncle. S.M. and Cover lived in the same mobile home park in Washougal, Washington. S.M. referred to Cover as her cousin or as "Uncle Jeff." 2 Verbatim Report of Proceedings (VRP) at 274.
>
> In the summer of 2006, S.M. was staying at Cover's house, where Cover lived with his sister. Cover came home drunk and laid next to S.M. on the couch. Cover began kissing S.M., and touching her body and breasts. Cover then took S.M. to his bedroom and had sexual intercourse with her.
>
> Thereafter, the sexual contact between S.M. and Cover became frequent. S.M. testified that Cover would come over to S.M.'s house and ask Sandra or Mike if S.M. could come baby sit for his girlfriend, Julie Barnett. Barnett also lived in the mobile home park. Cover would then take S.M. to either his house or Barnett's house, where he would then have intercourse with S.M. On one particular occasion, S.M. was at Cover's house and he performed oral sex on her while she performed oral sex on him.
>
> After that incident, at the end of February or the beginning of March in 2007, while S.M. was watching Barnett's kids and drinking beers with Cover, Cover asked

Barnett if Barnett would "fool around" with him and S.M. 1 VRP at 189. Barnett eventually agreed, and the three went to Barnett's bedroom. In the bedroom, Cover had sexual intercourse with S.M. and performed oral sex on S.M. Barnett also had sexual contact with S.M.

B.  THE ABUSE IS DISCLOSED

Megan Cover was S.M.'s aunt. Megan lived in the same mobile home park as S.M. At an Easter party in 2007, S.M. asked Megan if Barnett had a sexually transmitted disease. Nothing more was said about it that day, but a couple days later, Megan asked S.M. why she was curious about Barnett's sexual health. At that point, S.M. began crying and disclosed that she and Cover were having sex and then described the incident with Barnett in Barnett's bedroom.

Megan called the police, and the police responded within 15 to 20 minutes. The responding officers were Sergeant Bradley Chicks and Officer Kim Yamashita. The officers interviewed S.M. at Megan's house.

C.  COVER MARRIES S.M.

The State filed criminal charges against Cover and Barnett in April or May of 2007. After the charges were filed, Cover's father, Sandra, Mike, and Cover decided that Cover and S.M. should marry so that Cover would not get in trouble. They decided that Cover and S.M should go to Mississippi to be married. Sandra and Mike took S.M. out of school and flew her to Mississippi. Cover drove to Mississippi with his father and married S.M. in Mississippi when S.M. was 15 years old. At the time of trial in 2016, S.M.'s highest level of education completed remained the eighth grade.

After Cover married S.M., S.M. "hid out at [Cover's] dad's house" in California "[be]cause everyone was looking for [S.M.]." 2 VRP at 199. After an unknown length of time, but spanning several months, Cover called and said the charges had been dismissed. S.M. then took a bus from California back to Washougal.

Upon her return to Washougal, Cover decided to marry S.M. a second time, "to make sure that [Cover and S.M. were] married." 2 VRP at 200. On or about S.M.'s 16th birthday, Cover married S.M. in Idaho.

D.  CRIMINAL CHARGES AGAINST COVER ARE FILED AGAIN

On July 30, 2015, the State charged Cover a second time for his conduct against S.M. The charging information alleged three counts of third degree rape of a child. The information was subsequently amended to allege three counts of third degree rape of a child, with each count having occurred between April 1, 2006 and April 14, 2007. The case proceeded to trial on February 8, 2016.

REPORT AND RECOMMENDATION - 3

E. RELEVANT POINTS OF THE TRIAL

   1. Testimony

At trial, S.M. testified that there were several other instances of sexual intercourse that occurred prior to her marriage to Cover. She described a time at Cover's house, sometime after the incident involving Barnett, where Cover had sexual intercourse with her. In all, S.M. estimated Cover had sexual intercourse with her 10 to 20 times before the police were called.

Cover sought to impeach S.M.'s testimony by introducing a recantation letter. S.M. testified that the letter was written in her handwriting, but she did not recall writing the letter and statements made in the letter were false.

To rehabilitate S.M.'s credibility, the State sought to introduce prior statements S.M. made to Megan and the responding officers that were consistent with S.M.'s testimony at trial. Specifically, the State sought to introduce testimony of what S.M. had told them about the ongoing sexual relationship with Cover. Defense counsel agreed that such testimony was appropriate, saying "I'm not disagreeing with what [the State is] saying—they can use [ER] 613 for this purpose." 2 VRP at 264. Defense counsel continued, "I would agree that we have impeached her with this letter and so theoretically the court can allow for this witness and other witnesses through Rule 613 to rehabilitate her as to prior consistent statements with her testimony from today," and then asked the court to limit the testimony and not allow substantive evidence to be presented. 2 VRP at 265. The trial court ruled the rehabilitative testimony would be admitted with the limitation that the "witness may be asked about the prior disclosure but we'll limit it to instances—or at least the acknowledgement that [S.M.] indicated that she had sex with the Defendant and that she also may have had sex with the Defendant and Julie [Barnett]." 2 VRP at 268.

Chicks and Yamashita also testified at Cover's trial. Both testified that when they interviewed S.M., S.M. disclosed to them that Cover had been having sexual intercourse with her and that on one occasion both Cover and Barnett had sexual intercourse with her. Chicks also testified that S.M. told him about having oral sex with Cover and that she detailed the first time Cover had sexual contact with her. When asked what S.M. had disclosed regarding the first time Cover had sexual contact with S.M., Chicks stated, "Yes she was laying on the couch—it was the summer. She described it June or July of 2006. She would have been fourteen years old and she was awakened on the couch with him coming in." 2 VRP at 325.

At this point, Cover moved to strike and for a mistrial. Cover argued that this warranted a mistrial, or at least the statement to be stricken, because S.M. had not testified as to the time of the year that this incident occurred. The State argued that a mistrial was not warranted because evidence supporting that statement and the time of year had already been ruled admissible, as statements made by a party

REPORT AND RECOMMENDATION - 4

opponent, and would be introduced shortly. The trial court granted the motion to strike and denied the motion for mistrial. The trial court instructed the jury to "disregard the statement that the—[S.M.] may have been fourteen—that the incident may have occurred in the summer—June—July of the prior year—2006." 2 VRP at 329.

A short time later, Chicks testified that when he interviewed Cover, Cover told him that the first time he had sexual contact with S.M. had been in the summer of 2006. No objection was made.

Chicks further testified that during his interview with Cover, Cover initially denied having a sexual relationship with S.M., but eventually asked, "[I]f I tell you the truth what's in it for me—will you let me go?" 2 VRP at 339. Cover then admitted that he had touched and kissed S.M. on the couch. About an hour and a half later, as law enforcement was preparing to transport Cover to jail, Cover admitted to Chicks that he had a sexual relationship with S.M., and that the last time he had sex with her was April 14, 2007, in Barnett's bedroom. Cover also admitted to the time he had sexual intercourse with S.M. and Barnett.

After the State rested, the defense called Shannon Patton. Patton was Cover's current fiancé. She testified that she knew Cover and S.M. when they were married, and S.M. had told Patton that Cover and S.M. did not have sex until they were married. On cross-examination, the State asked Patton if she had "spoken with the Defendant on the phone since he's been in custody at the Clark County Jail" and if she knew that those phone calls were recorded. 3 VRP at 449–50. Cover did not object. Patton answered that she had spoken to Cover and she did know the calls were recorded.

   2. Closing Arguments

During the State's closing, the prosecutor argued:

> So Count Three—the Defendant himself actually gives us the dates—the exact date for Count Three. And you can recall Sgt. Chicks testified that the Defendant started admitting to him what happened—admitted to him that he was in this relationship with [S.M.]—that he loved her—he couldn't help it and yes he's been having sex with her.
>
> He admitted the last time they had sex was Saturday, April—let me make sure I'm right—April 14th, 2007. They [Chicks and Cover] were having this conversation—I believe—on April 21st—just about a week later and the Defendant admits that was the last time he had sex with her. That he picked her up early in the morning and brought her to Julie's. That's consistent with what [S.M.] told us. Again [S.M.] couldn't remember the exact dates but she said that after the threesome the Defendant took her to Julie's house to have sex multiple times—and he took her back to his house to have sex as well.

REPORT AND RECOMMENDATION - 5

> She said that he would pick her up in the morning and bring her over to Julie's house while Julie was at work and Julie's kids would be asleep or in their rooms. Well that's what the Defendant said happened on the 14th. He said he picked up [S.M]—they went to the house and Julie's kids were asleep during that incident.
>
> ....
>
> Now these aren't the only incidents [S.M.] describes. In addition to these kind of three separate and distinct times that they had sexual intercourse as defined here she also describes that they had oral sex on occasion.
>
> She described—calling what she called 69 where she gave him oral sex and he gave her oral sex at the same time. She said that happened before the threesome with Julie Barnett. And she described that he had sex with her at his house as well.

3 VRP at 493–95.

The defense argued in closing, "This case ultimately comes down to the words of [S.M.] .... It ultimately comes down to her word." 3 VRP at 501. The defense then proceeded to point out all of the pieces of the abuse that S.M. could not remember or had recanted and argued that Megan did not like Cover or Barnett.

In rebuttal, the prosecutor responded,

> Now for the defense's theory to be true—that this didn't happen—we would have to have two false confessions—the Defendant and the Ms. Barnett. We'll get into specifics.
>
> We would have to have two people that are saying—that are talking about these sex acts that are making these accusations— two separate times—nine years apart. We would have to have [S.M.] not only lying to you today but also lying back in 2007.
>
> And Julie Barnett would have to be lying today and also in 2007. We would have to have Megan being the mastermind behind this whole thing.

3 VRP at 522.

F.   VERDICT AND SENTENCE

The jury convicted Cover of all three counts of third degree rape of a child. The jury also found by special verdict the aggravating factors that each count was committed as "part of an ongoing pattern of sexual abuse of the same victim under

REPORT AND RECOMMENDATION - 6

the age of 18 years manifested by multiple incidents over a prolonged period of time," and that "the defendant demonstrate[d] or display[ed] an egregious lack of remorse." Clerk's Papers (CP) at 163–68.

Cover's offender score was calculated to be 6. The Department of Corrections recommended an exceptional sentence upward in its presentence investigation report. At sentencing, the State requested an exceptional sentence upward. Defense counsel conceded that an exceptional sentence upward was appropriate. The defense counsel argued:

> So the question for the court is not whether or not to impose punishment. Obviously punishment is appropriate and it's our contention that it's not even a question of whether the court should go above the standard range.
>
> We think the fact that the jury found the aggravating factors that the court has a basis and—and perhaps even an obligation to go above the standard range of—up to sixty months. But I think forty-eight or forty-six to sixty months would be the standard range for each of the three counts.
>
> We'd ask the court to consider exceeding the sixty months but by a smaller margin than as suggested either by the State or by the Department of Corrections. A hundred and eighty months or a hundred and fifty months would be—I think—an exceedingly long sentence for what was alleged and what was proven here—longer than we feel is necessary.

4 VRP at 557–58.

The sentencing court found an exceptional sentence upward was appropriate and sentenced Cover to 180 months. In making this finding, the sentencing court read RCW 9.94A.537 out loud, noted that the jury had found aggravating circumstances in this case, and explained that the court had authority to impose an exceptional sentence upward. The sentencing court discussed the purpose of the sentencing statute, stated that there was no doubt that Cover's acts were egregious and without remorse, and said:

> As I indicated both substantial and compelling reasons are the fact that you engaged in this sex with a fourteen year old—that you continued to engage in sex with this fourteen year old—that you married her—you took her to Mississippi—you took her to Idaho. You then had her move to California with her [sic]. At some point in time—you essentially abandoned her at some point in time.
>
> The facts I heard do not warrant any leniency whatsoever. I'm going to go ahead and follow the recommendations of the State.

REPORT AND RECOMMENDATION - 7

>4 VRP at 564–65. The sentencing court also entered written findings and conclusions for imposing the exceptional sentence, citing the jury's findings that the two aggravators applied to each of the three crimes, and concluding that there were substantial and compelling reasons to impose the exceptional sentence.

*State v. Cover*, 200 Wash. App. 1044, *1-5 (2017) (internal footnotes omitted); Dkt. 32-1, pp. 801-09 (Exhibit 12).

### B. Procedural Background

#### 1. *Direct Appeal*

Petitioner challenged his Clark County Superior Court ("trial court") judgment and sentence on direct appeal. *See* Dkt. 32-1, pp. 682-730, 733 (Exhibits 9, 10). The state court of appeals affirmed Petitioner's judgement and sentence. *Id*. at pp. 800-32 (Exhibit 12). Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *Id*. at pp. 834-94 (Exhibit 13). On February 7, 2018, the state supreme court denied Petitioner's petition for review without comment. *Id*. at p. 896 (Exhibit 14). The state court of appeals issued its mandate on March 19, 2018. *Id*. at p. 898 (Exhibit 15).

#### 2. *Personal Restraint Petition*

On January 28, 2019,[1] Petitioner filed a personal restraint petition ("PRP") seeking state post-conviction relief. *See* Dkt. 32-1, pp. 901-29 (Exhibit 16). The state court of appeals denied the PRP. *Id*. at pp. 1072-76 (Exhibit 19). Petitioner sought discretionary review, which was denied by the deputy commissioner of the state supreme court on June 4, 2020. *Id*. at pp. 1086-1114, 1149-54 (Exhibits 22, 25). Petitioner filed a motion to modify the ruling on September 18, 2020. *Id*. at pp. 1156-76 (Exhibit 26). Petitioner's motion to modify was denied by the state

---

[1] The prison "mailbox rule" is not available when filing a PRP in Washington State; therefore, Petitioner's PRP was deemed filed on the date it was received by the state clerk's office. *In re Carlstad*, 150 Wash.2d 583, 590 (2003).

REPORT AND RECOMMENDATION - 8

supreme court on November 4, 2020. *Id*. at p. 1179 (Exhibit 27). The state court of appeals issued the certificate of finality on November 25, 2020. *Id*. at p. 1181 (Exhibit 28).

      3.  *Federal Petition*

On January 22, 2019, Petitioner filed his Petition. Dkts. 1, 3. In the Petition, Petitioner raised the following grounds for relief:

1. Insufficient evidence on corpus delicti grounds;
2. Sixth Amendment rights were violated when the trial court used facts that did not support aggravators (exceptional sentence);
3. Ineffective assistance of counsel under the Sixth Amendment – Counsel asked for exceptional sentence, failed to inform Petitioner of a plea deal, and failed to provide a medical expert; and
4. Prosecutorial misconduct.

Dkt. 3. On April 17, 2019, Respondent filed, and served on Petitioner, an Answer. Dkts. 9, 10. Proceedings in this case were stayed during the pendency of Petitioner's state PRP and, on January 12, 2021, the stay was lifted. Dkts. 7, 12, 26. On March 1, 2021, Respondent filed an Answer and the state court record. Dkt. 31, 32. After the Court granted a lengthy extension of time, Petitioner filed a traverse on June 29, 2021. Dkt. 36; *see also* Dkt. 35. In the June 2021 traverse, Petitioner raised additional grounds for relief. Dkt. 36. As the traverse was not the proper pleading to raise new grounds for relief, the Court directed Petitioner to file a motion to amend if he sought to pursue different grounds for relief. *See* Dkt. 38.

Petitioner filed a motion to amend and proposed amended petition. Dkt. 45. While Respondent did not oppose the motion to amend, Respondent did not waive any defense based upon exhaustion, procedural bar, or statute of limitations. Dkt. 46. On November 22, 2021, the Court granted Petitioner leave to file an amended petition and directed the Amended Petition to be filed. Dkts. 47, 48. The Court stated that the Amended Petition superseded the original petition and the previously filed petition and answer to the petition were moot. Dkt. 47.

Therefore, the only matters before the Court were the five grounds raised in the Amended Petition.

In the Amended Petition, Petitioner asserted the following grounds for relief:

1. Insufficient evidence;
2. Ineffective assistance of counsel – counsel failed to provide a medical expert to rebut the State's medical expert;
3. Ineffective assistance of counsel – counsel requested and argued for an exceptional sentence upward;
4. Ineffective assistance of counsel – plea and settlement offer; and
5. Acts charged and tried to jury were beyond the limitations of actions of RCW 9A.04.080.

Dkt. 48. On January 5, 2022, Respondent filed, and served on Petitioner, an Answer to the Amended Petition. Dkt. 49. In the Answer, Respondent asserted the grounds are either untimely, unexhausted and procedurally barred from federal review, or that the state court's adjudication was not contrary to, or an unreasonable application of, clearly established federal law. *Id*. After several extensions of time, Petitioner filed a Traverse on May 6, 2022. Dkt. 54; *see also* Dkts. 50-53.

On August 10, 2022, the undersigned entered an R&R recommending the Amended Petition be dismissed and this case be closed. Dkt. 55. Judge Settle adopted the R&R as to Grounds 1-4 and reserved ruling on Ground 5. Dkt. 59. Judge Settle directed the parties to submit supplemental briefing on Ground 5 and re-referred this matter to the undersigned for consideration of Ground 5 on the merits. *Id*. Respondent filed, and served on Petitioner, a supplemental answer on March 24, 2023. Dkt. 60. On May 24, 2023, Petitioner filed a supplemental traverse. Dkt. 63.

II. Discussion

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a

REPORT AND RECOMMENDATION - 10

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of

state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

In Ground 5, Petitioner contends the acts charged and tried to jury were beyond the limitations of actions of RCW 9A.04.080. Dkt. 48 at 12; *see also* Dkt. 63. Respondent maintains Ground 5 is not cognizable in a federal habeas proceeding and, if it is, the state court's adjudication of Ground 5 was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 60.

In finding Petitioner was not entitled to relief for Ground 5, the state supreme court stated:

> By second information filed in February 2016, the State alleged that Mr. Cover committed all three of his crimes in the period between April 1, 2006, and April 14, 2007. In rejecting Mr. Cover's argument on this point, the Court of Appeals observed that the statute of limitations when the alleged crimes were committed was seven years, citing former RCW 9A.04.080(1)(c) (2006). It then noted that before that limitation period expired, the legislature in 2009 extended the limitation period to the victim's 28th birthday. Former RCW 9A.04.080(1)(c). And before that limitation period expired, the legislature extended the period to the victim's 30th birthday. Former RCW 9A.44.080(1)(c) (2013). The second amended information here was filed before the victim turned 30. Relying on the principle that an extension of the statute of limitations applies if it was enacted before the previous limitation period expired, the court held that the State filed the second amended information within the statute of limitations. *See State v. Hodgson*, 108 Wn.2d 662, 666-67, 740 P.2d 848 (1987).
>
> But the court mistakenly believed that the statute of limitations was seven years when the crimes were committed. The seven-year period that the court cited (former RCW 9A.04.080(1)(c) (2006)) did not apply to third degree rape of a child. And since in fact no limitation period was then specified for that crime, the catch-all limitation period of three years applied. Former RCW 9A.04.080(1)(h) (2006); *State v. Novotny*, 76 Wn. App. 343, 346, 884 P.2d 1336 (1994), *abrogated in part on other grounds by State v. Peltier*, 181 Wn.2d 290, 332 P.3d 457 (2014). The 2009 amendment extending the limitation period for third degree child rape to the victim's 28th birthday took effect July 26, 2009. Thus, if Mr. Cover committed any of the acts for which he was charged before July 26, 2006, the three-year statute of limitations would have expired before the limitation period was extended, barring prosecution for those acts. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 808, 383 P.3d 454 (2016). And since here the to-convict instructions stated only the time

periods alleged in the information, and the jury rendered general verdicts without specifying the time of commission, the charging periods alleged in the information (beginning April 1, 2006) raise the possibility that Mr. Cover was convicted for acts committed outside the statute of limitations. Generally, if the evidence does not provide a basis for determining that a crime occurred within the limitation period, the conviction for that crime cannot stand. *Novotny*, 76 Wn. App at 346; *State v. Dash*, 163 Wn. App. 63, 70-71, 259 P.3d 319 (2011).

It is plain, however, that two of Mr. Cover's convictions were based on acts that occurred after July 26, 2006. For the second count, the State relied on an act that the evidence showed occurred in February or March of 2007, and for the third count it relied on an act that occurred in April 2007. But the evidence is less certain as to the first count. The State urges that the victim testified that all of the acts occurred when she was 15, which she turned on [redated] 2006. But in fact she was equivocal on this point, testifying that some acts could have occurred when she was 14. For the first count, the State relied on the first sexual encounter between Mr. Cover and the victim. The victim did not remember the precise time of that encounter, but in a police interview Mr. Cover admitted to the act and said it occurred in the summer of 2006. And in closing argument, the State specifically described the act underlying the first count as occurring in the summer of 2006. Thus, the act might have been committed before July 26, 2006.

It does not follow, however, that Mr. Cover is entitled to relief. On direct appeal he might have been, but as indicated, he bears the burden on collateral review of showing by a preponderance of evidence that he was actually and substantially prejudiced or that he suffered a complete miscarriage of justice. *Yates*, 177 Wn.2d at 17. While the "summer of 2006" could encompass a time before July 26 of that year, it could also encompass a considerable time after that date. Mr. Cover does not show that he was in fact convicted in the first count based on an act committed outside the statute of limitations. Mere possibility does not establish actual and substantial prejudice or a complete miscarriage of justice. *See In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013) (must show actual prejudice on a more likely than not basis).

Dkt. 32-1 at 1150-52.

Respondent asserts Ground 5 is not cognizable in federal habeas proceedings because it is a matter of state law. Dkt. 60. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "[A]s a matter of constitutional law, ...

statutes of limitation go to matters of remedy, not to destruction of fundamental rights." *Chase Sec. Corp. v. Donaldson,* 325 U.S. 304, 314 (1945). "Consequently, a state court's failure to properly apply a statute of limitations does not violate due process or any other provision of the Constitution or a federal statute." *Cantrell v. Pogue*, 2015 WL 5821621, at *4 (D. Ariz. Sept. 11, 2015), *report and recommendation adopted*, 2015 WL 5770563 (D. Ariz. Oct. 2, 2015); *see also Loeblein v. Dormire,* 229 F.3d 724, 726 (8th Cir. 2000) (rejecting a claim that prosecution was time-barred by applicable state statutes of limitations because "a state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute.").

Here, Petitioner is challenging the application of a state law – whether the state court properly applied the state's statute of limitations. Dkts. 48, 63. As stated above, courts have routinely found the misapplication of a state statute of limitations does not raise a federal habeas claim. As federal habeas relief is not available for alleged errors in the interpretation or application of state law, the Court finds Ground 5 is not cognizable in this § 2254 proceeding.

Even if this claim was cognizable in a federal habeas proceeding, Petitioner has not identified "clearly established federal law" that prohibits a conviction on criminal charges merely because they were brought past a state statute of limitations. *See Storey v. Paramo*, 2019 WL 1317792, at *29 (S.D. Cal. Mar. 22, 2019), *report and recommendation adopted*, 2019 WL 4040701 (S.D. Cal. Aug. 27, 2019). Petitioner has also not shown the United States Supreme Court has established clear law on whether a defendant is entitled to have the jury determine if the charged counts are within the limitations period. *Ortega v. Seibel*, 2017 WL 3033421, at *13 (C.D. Cal. July 12, 2017), *report and recommendation adopted*, 2017 WL 3026384 (C.D. Cal. July 14, 2017). *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (when no Supreme Court

REPORT AND RECOMMENDATION - 14

decision "squarely addresses" issue and existing Supreme Court precedent "gives no clear answer to the question presented," it cannot be said that state court unreasonably applied clearly established Federal law). Courts have "found no Supreme Court decision that precludes a state appellate court from determining on the basis of the record, and by a preponderance of the evidence, that a criminal charge fell within the applicable statute of limitations." *Ortega*, 2017 WL 3033421 at *13; *Smith v. Ryan*, 220 Fed.Appx. 563, 565 (9th Cir. 2007) (holding that a California Court of Appeal decision finding that, under California law, charges against petitioner were not time-barred was not contrary to or unreasonable application of federal constitutional right to jury determination); *Thibes v. State*, 2015 WL 4269966, at *13 (C.D. Cal. Mar. 27, 2015) ("The Supreme Court has not decided whether a defendant has a constitutional right to have a jury decide whether charges were timely under a state's statute of limitations."), *accepted by* 2015 WL 4241049 (C.D. Cal. July 9, 2015). As there is no clearly established Supreme Court precedent, Petitioner has failed to show the state court's determination of Ground 5 was error.

      Moreover, Petitioner has not shown any constitutional infirmity in the state court's application of the statute of limitations. The state court found that, even if the charging documents identified a time period that was partially outside the limitations period, Petitioner was not harmed by the error. The parties do not dispute that, to be within the state statute of limitations, Petitioner had to have committed the alleged crimes on or after July 26, 2006. *See* Dkts. 60, 63, 32-1 at 1150-52. While the charging periods alleged in the information began April 1, 2006, the state argued the first crime (Count 1) occurred in the summer of 2006. *See* Dkt. 32-1 at 514-32, 1150. Counts 2 and 3 were alleged to have been committed within the limitations period. *See* Dkt. 32-1 at 514-32 (Count 2 occurred in February or March of 2007 and Count 3

occurred on April 17, 2007). Thus, at issue is whether the conduct alleged in Count 1 occurred before July 26, 2006.

The record shows Petitioner admitted to committing the crime charged in Count 1 in the summer of 2006. *See* Dkt. 32-1 at 27, 361-63. Petitioner has not provided evidence showing he did not commit the crime or that he committed the crime before July 26, 2006. As the state court reasonably concluded, the record does not show Petitioner committed the crime alleged in Count 1 outside the limitations period. *See* 32-1 at 1150-52. Rather, the state court record provides ample evidence to find Petitioner committed the crime alleged in Count 1 within the limitations period because the "summer of 2006" included a sufficient period of time after July 26, 2006, wherein the jury could conclude Petitioner committed the crime alleged in Count 1. *See id*. at 361-63 (trial testimony that Petitioner admitted to beginning the sexual relationship with the victim in summer of 2006). Therefore, Petitioner has not shown any error related to the limitations period prejudiced Petitioner. As such, "any constitutional infirmity in the state courts' application of the statute of limitations did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ortega*, 2017 WL 3033421 at *13 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

For the above stated reasons, Petitioner has not shown Ground 5 is cognizable in a federal habeas proceeding. Furthermore, Petitioner has not shown the state courts' decision was contrary to or an unreasonable application of clearly established federal law and that he is entitled to habeas relief. Accordingly, the Court recommends Ground 5 be denied.

### III. Evidentiary Hearing

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to hold an evidentiary hearing in this case because, as discussed in this Report and Recommendation, Petitioner's Ground 5 may be resolved on the existing state court record.

## IV. Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's Ground 5 or would conclude the issues presented in Ground 5 of the Amended Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to Ground 5.

## V. Conclusion

For the above stated reasons, the Court concludes Ground 5 is not cognizable in a federal habeas petition and, if it was, the state court's determination of Ground 5 was not contrary to, nor an unreasonable application of, clearly established federal law. The Court finds an evidentiary hearing is not necessary. Therefore, the Court recommends the Ground 5 of the Amended Petition be denied, a certificate of appealability not be issued, and this case be closed.[2]

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on July 28, 2023, as noted in the caption.

Dated this 12th day of July, 2023.

David W. Christel
Chief United States Magistrate Judge

---

[2] In his supplemental traverse, Petitioner briefly requests the appointment of counsel. *See* Dkt. 63 at 15. The request for counsel was not properly filed as a motion. Moreover, the Court finds Petitioner adequately articulated his claim for relief and finds counsel is not warranted in this case. Therefore, the Court denies the request for Court-appointed counsel.